**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

Mark Wolek,

    Plaintiff,

    -vs-

Northern Ohio Surgery Center, LLC,

    Defendants.

Case No. 1:25-cv-00248-PAB

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OPINION & ORDER**

Currently pending before the Court is Defendants Northern Ohio Surgery Center, LLC ("NOSC"), Reuben Gobezie ("Gobezie"), and Mary Meier's ("Meier") Motion for Summary Judgment (the "Motion"). (Doc. No. 34.) Plaintiff Mark Wolek ("Plaintiff") filed an Opposition on February 20, 2026, to which Defendants replied on March 20, 2026. (Doc. Nos. 37, 39.) For the reasons stated herein, Defendants' Motion is GRANTED.

I.    **Background**

    A.    **Factual background**

        1.    **Plaintiff begins his employment with NOSC on April 22, 2024**

NOSC is an outpatient orthopedic surgery center located in Mayfield Heights, Ohio. (Doc. No. 34-2, ¶¶ 2–3.) NOSC exclusively provides services to patients in Ohio and it does not have any offices outside Ohio. (*Id.* at ¶ 4.) Gobezie is an orthopedic surgeon and an owner and director of NOSC. (Doc. No. 18, ¶ 3.) He is a resident of Virgina but spends approximately fifty percent of his time in Ohio while working for NOSC. (Doc. No. 34-2, ¶ 6.) Meier was employed by NOSC as the Chief Executive Officer. (*Id.* at ¶ 4.) Meier is an Ohio resident and performed all of her job duties in Ohio. (Doc. No. 34-3, ¶¶ 3, 7.)

On April 22, 2024, Plaintiff commenced his employment with NOSC.  ( Doc. No. 18, ¶ 8.) Plaintiff was hired as a Revenue Cycle Manager in a remote capacity.  (*Id.* at ¶ 8.)  Although NOSC has never owned property or had an office in New Jersey, Plaintiff worked remotely in New Jersey. (Doc. No. 34-2, ¶ 5; Doc. No. 18, ¶ 9.)  Plaintiff's job was to oversee NOSC's processes with its external third-party vendors, including reviewing and analyzing the vendors' reports and making recommendations to maximize NOSC's revenue.  (Wolek Dep. 62:13–64:5.)  At all times relevant herein, Plaintiff reported to Meier, who in turn reported to Gobezie.  (Gobezie Dep. 25:16–26:23.) Throughout his employment, Plaintiff was the only NOSC employee residing in New Jersey.  (Doc. No. 34-2, ¶ 10.)  Neither Gobezie nor Meier ever went to New Jersey during Plaintiff's employment. (*Id.* at ¶ 12; Doc No. 34-3, ¶¶ 8–10.)  Indeed, Meier was in Ohio whenever she communicated with Plaintiff about his job duties.  (Doc. No. 34-2, ¶ 7.)

Shortly after Plaintiff began his employment with NOSC, Plaintiff had some performance issues—specifically Gobezie and Meier found that he delivered incomplete work product.  (Doc. No. 34-18.)  As a result of this, in early May, Defendants began discussing terminating Mr. Wolek's employment due to poor performance.  (Doc. No. 34-2, ¶ 11; 34-3, ¶ 6; Doc. No. 34-18.)  These discussions were held in Ohio and Virginia, and never in New Jersey.  (Doc. No. 34-2, ¶ 15; Doc. No. 34-3, ¶ 11.)  Defendants, however, did not terminate his employment in May.

### 2.    Defendants continue to find Plaintiff's performance deficient

On June 15, 2024, Gobezie asked Plaintiff to create a spreadsheet in a specific format but Plaintiff was unable to complete the task to Gobezie's satisfaction.  (Wolek Dep. 88:14–90:9; Doc. No. 34-8; Gobezie Dep. 54:21-57:10.)  Ultimately, Meier completed the assignment for Plaintiff. (Doc. No. 34-3, ¶ 14.)  Then, on June 17, 2024, Plaintiff, Gobezie and Meier had a call with one of

NOSC's vendors.  (Gobezie Dep. 43:11–47:12; Wolek Dep. 85:12–86:7.)  During that phone call, Plaintiff took a "harsh tone" with the vendor, which Gobezie did not approve.  (Gobezie Dep. 42:3-47:12; Wolek Dep. 85:16-21.)  The next morning, Plaintiff sent an email to the vendor, which Gobezie perceived as unnecessary.  (Gobezie Dep. 43:11–47:12.)  Gobezie emailed Plaintiff "the [vendor] is doing what we asked…. [n]o need for a harsh response."  (Doc. No. 34-7.)

Two minutes after Plaintiff sent his email to the vendor, Meier sent Gobezie the following text message:  "I am going to start looking for a new revenue cycle manager. I think Mark is nice enough, but he says and does things that are not at the level [w]e need him to be."  (Doc. No. 34-20.)  Gobezie responded "Perfect" and that "[h]is email is stupid…too."  (*Id.*)  Meier responded "[t]hat is actually what sold me… very unprofessional" and that "[h]e also doesn't know how to do Excel spreadsheets and that really bothers me for revenues cycle manager."  (*Id.*)  These discussions were also in Ohio and Virgina and were never in New Jersey.  (Doc. No. 34-2, ¶ 15; Doc. No. 34-3, ¶ 11.)

Defendants did not terminate his employment, however, at this time.  Indeed, Plaintiff's employment would continue with NOSC for another two weeks.

### 3. Plaintiff reports a company-wide issue with NOSC's 401(k) plan

Upon Plaintiff's hiring, he enrolled in NOSC's 401(k) plan and elected to contribute a portion of his paycheck to the plan.  (Doc. No. 18, ¶ 12.)  Around June 21, 2024, Plaintiff discovered that his 401(k) contribution under NOSC's retirement plan was deducted from his most recent paycheck but not deposited into his 401(k) account.  (Wolek Dep. 93:13-94:7.)  After discovering this, Plaintiff contacted Guideline, Inc. ("Guideline"), who administers NOSC's 401(k) plan.  (Wolek Tr. at 97:19-23.) They advised him that they would need to reach out to NOSC to investigate the issue.  (*Id.*)  Subsequently, Plaintiff reached out to Meier through a text message and informed her that "the 401k

3

processing has stopped so no money has been sent to the accounts[.] I called and it stopped in May."

(Doc. No. 34-10.)    During this text exchange, Meier informed Plaintiff that Lauren Johnson

("Johnson"), another NOSC employee, assists with payroll.  (*Id.*)

Plaintiff then forwarded an email, which is dated June 21, 2024, from Guideline to Johnson.

(Doc. No. 34-12, PageID #253.)  Therein, an employee from Guideline wrote in relevant part:

> I just want to verify, does the missing money that you were looking for was [it]
> your contributions?  If so, I can see that your employer's payroll system is currently
> not connected with Guideline, causing no payroll or contribution reports being
> submitted to your account.  This is not isolated to your account and the issue is with
> the plan itself.

(*Id.*)  When Plaintiff forwarded this email to Johnson, he wrote: "I really need an explanation of this

– [a]s this revolves around missing money."  (*Id.*)  Johnson responded on June 24, 2024 that she is

"working with Guideline for them to provide an explanation.  I will provide an update as soon as

possible.  I am working on this.  On our end everything shows connected so I am working to find the

problem.  I am sorry for the trouble."  (*Id.* at PageID #254.)

Johnson did as she promised and took steps to fix the issue with Guideline.  (Doc. No. 34-27.)

On June 26 and June 27, 2024, Johnson emailed Plaintiff informing him that she was working with

Guideline to get the issue resolved.  (Doc. No. 34-12, PageID #251–52.)   Ultimately, Johnson

resolved the issue on July 17, 2024.  (Doc. No. 34-27, ¶ 11.)

Plaintiff believed that the issue with his 401(k) account was illegal.  (Wolek Dep. 135:21–

24.)  He did not ever expressly inform Defendants that he believed they were violating the law.

(Wolek Dep. 133:1–20.)  He testified, however, that he informed Gobezie that he believed that federal

guidelines were not being followed.  (*Id.*)

4

**4.  After raising the issue with NOSC's 401(k) plan, Defendants terminate Plaintiff's employment**

On July 3, 2024, at 8:08 a.m., or before the 401(k) issue was resolved, Gobezie sent Plaintiff an unrelated email concerning Plaintiff's job performance:

Hi Mark:

Happy 4th!

I want to ask that we improve communications with me *drastically*.  I need to receive a report from you daily on status of claims follow-up and any issues you are seeing in our RCM from SIS and AMD.  Give me a sense of the RFI's and requests f/u on documentation or billing.  I need to see something….

Thank you,
RG

(Doc. No. 34-9 (emphasis in original).)  Plaintiff responded at 8:15 a.m.: "Ok I will send you daily status updates on reviews and issues impacting the revenue cycle.  I was not aware that you wanted or needed this information.  I assumed you had been receiving all the status reports from AMD as well as SIS." (*Id.*)

Later that day, Plaintiff then sent one final email to Johnson concerning the 401(k) issue, but this time, he also copied Gobezie.  He wrote, in relevant part:  "[d]o you have any updates on this issue?  Following Friday's last paycheck – I am now missing two deposits to the Guideline 401K program." (Doc. No. 34-12, PageID #251.)

Two days later, after the July 4th holiday, Meier texted Gobezie, in relevant part, that "we can let [Plaintiff] go . . . I can call him Monday or if you have time you can call today." (Doc. No. 34-19, PageID #296.)  Gobezie responded "I will deal with Mark Wolek. No worries." (*Id.* at PageID #297.)  Gobezie and Meier were located in Ohio during this exchange.  (Doc. No. 34-2, ¶ 16; Doc. No. 34-3, ¶ 18.)  Gobezie then called Plaintiff and terminated his employment.  (Doc. No. 18, ¶ 34.)

5

This civil action followed.

**B.      Procedural background**

On November 27, 2024, Plaintiff initiated this action by filing its Complaint in the New Jersey Superior Court.  (Doc. No. 1-2.)  Therein, Plaintiff brings two claims for relief:  (1) Retaliation in Violation of New Jersey Conscientious Employee Protection Act ("CEPA"); and (2) Wrongful Discharge in Violation of Public Policy.  On January 17, 2025, Defendants removed the case to the United States District Court for the District of New Jersey.  (Doc. No. 1.)  On February 6, 2025, the parties filed a Joint Stipulation to Transfer Venue to the United States District Court for the Northern District of Ohio, Eastern Division.  (Doc. No. 13.)  On February 7, 2025, this case was transferred to this Court and the undersigned was assigned to the case.  (Doc. Nos. 14, 15.)

On March 7, 2025, Defendants filed a Motion for Sanctions Under 28 U.S.C. § 1927 for Costs, Expenses, and Attorneys' Fees Associated with Plaintiff's Wrongful Filing of this Matter in New Jersey (the "Motion for Sanctions").  (Doc. No. 26.)  On March 20, 2025, Plaintiff filed his Opposition, to which Defendants replied on March 27, 2025.  (Doc. Nos. 26, 28.)  On November 26, 2025, the Court issued a Memorandum Opinion and Order denying Defendants' Motion for Sanctions.  (Doc. No. 32.)

Thereafter, after the close of discovery, on January 7, 2026, Defendants filed their Motion for Summary Judgment.  (Doc. No. 34.) Plaintiff filed his Opposition on February 20, 2026, to which Defendants replied on March 20, 2026.  (Doc. Nos. 37, 39.)  Accordingly, Plaintiff's Motion is ripe for review.

**II.      Standard of review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

6

dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487. At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*,

53 F.3d at 150).

### III.    Analysis

#### A.    Plaintiff concedes his common law wrongful discharge claim

In their Motion, Defendants argue that they are entitled to summary judgment on Plaintiff's wrongful termination claim under either Ohio or New Jersey Law.  (Doc. No. 34-1, PageID #186–192.)  In his Opposition, Plaintiff represents that he "withdraws Count II of his Complaint: Wrongful Discharge in Violation of Public Policy."   (Doc. No. 37, PageID #385.)   Based on Plaintiff "withdrawing" his wrongful termination claim, the Court deems Plaintiff to have waived any opposition with respect to the dismissal of that claim.  Accordingly, the Court enters summary judgment in Defendants' favor on Plaintiff's wrongful termination claim.  *Hupp v. CSX Transp., Inc.*, No. 5:21-CV-00968, 2023 U.S. Dist. LEXIS 96042, at *10 (N.D. Ohio May 31, 2023) (Barker, J.); *Dickman v. Kent*, No. 1:19-cv-01638, 2022 U.S. Dist. LEXIS 106276, at *16 (N.D. Ohio June 14, 2022) (Barker, J.).

#### B.    The Court finds that New Jersey law governs this dispute

Before turning to the merits of Plaintiff's CEPA claim, Defendants suggest that Plaintiff's CEPA claim fails for a simple reason—Ohio law governs this dispute and Ohio law does not recognize the CEPA.  (Doc. No. 34-1, PageID #178–79.)

As the parties agree, because this case was transferred to this Court under 28 U.S.C. § 1406(a) and 28 U.S.C. § 1631, the Court must apply Ohio's choice of law rules.  *Newberry v. Silverman*, 789 F.3d 636, 640–41 (6th Cir. 2015).  Ohio follows a two-step test set forth in the Restatement (Second) of Conflicts.  *Premium Freight Mgmt., LLC v. PM Engineered Sols., Inc.*, 906 F.3d 403, 406 (6th Cir. 2018).  Under this analysis, "[t]he first step is to determine if there is an actual conflict between the substantive laws of the states involved."  *Premium Freight*, 906 F.3d at 406–07 (citing *Glidden Co.*

*v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006)). "Only if they conflict must [the Court] proceed to the second step to choose between them." *Id.* (citing *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 288–89 (Ohio 1984)).

Here, there is an actual conflict between the CEPA and Ohio's whistleblower statute. Although Defendants skip this step in their Motion, Plaintiff argues that "the Ohio whistleblower statute does not provide complete relief because it does not provide for certain compensatory damages and does not specifically authorize punitive damages" and that the "CEPA, on the other hand, permits not only punitive damages but also any other remedy available in common-law tort actions." (Doc No. 37, PageID #391 (cleaned up).) The Court finds that Plaintiff's propositions of law are correct. *Compare Kulch v Structural Fibers*, 677 N.E.2d 308, 325 (Ohio 1997) ("The statute does not provide for certain compensatory damages and does not specifically authorize recovery of punitive damages"); *with Abbamont v. Piscaway Twp. Bd. of Educ.*, 650 A.2d 958, 964 (N.J. 1994) (holding that a plaintiff can recover punitive damages under the CEPA in limited circumstances). Accordingly, because of the different damages available to Plaintiff under the laws of Ohio and New Jersey, the Court finds that there is an actual conflict. *Mendoza v. J.M. Smucker Co.*, 674 F. Supp. 3d 439, 450 (N.D. Ohio May 22, 2023) ("Because the employment discrimination laws of Ohio and Louisiana conflict with respect to the availability of punitive damages, the Court must choose the law that applies to this case."); *Radair, LLC v. Alaska Airlines, Inc.*, No 2:20-cv-02286-MSN-cgc, 2022 U.S. Dist. LEXIS 10510, at *11 (W.D. Tenn. Jan. 20, 2022) ("Therefore, an actual conflict emerges because Plaintiff's punitive damages eligibility depends on which state's law applies").

Because there is an actual conflict, the Court proceeds to step two. For claims sounding in

9

tort,[1] the Court "must choose the law of the state with 'the most significant relationship to the occurrence and the parties.'" *Premium Freight*, 906 F.3d at 407 (quoting Restatement (Second) of Conflicts § 145(1)). In making this determination, the Court considers "(1) the place of business of the parties; (2) the place where the injury occurred; (3) the place where the conduct causing the injury occurred; (4) the place where the relationship, if any, between the parties is centered; and (5) any factors under Section 6 [of the Restatement] that [the Court] may deem relevant to the action." *Id.* (citing *Morgan*, 474 N.E.2d at 289). Section 6, in turn, provides the following factors:

(a)     the needs of the interstate and international systems,

(b)     the relevant policies of the forum,

(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)     the protection of justified expectations,

(e)     the basic policies underlying the particular field of law,

(f)     certainty, predictability and uniformity of result, and

(g)     ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws, § 6.

The place of injury is in New Jersey. The Court begins its analysis with the second factor. Defendants "acknowledge[] New Jersey as the likely place of injury because Plaintiff lived and worked there during his employment with NOSC." (Doc. No. 34-1, PageID #177.) Plaintiff

---

[1] Plaintiff's CEPA claim sounds in tort for purposes of a choice-of-law analysis. *Kirk v. Shaw Envtl., Inc.*, No. 1:09-cv-1405, 2010 U.S. Dist. LEXIS 51332, at *14 (N.D. Ohio May 25, 2010) ("Ohio treats claims for wrongful discharge in violation of public policy . . . as tort claims."); *see also Sharqawi v. Kirby Co.*,496 F. Supp. 3d 1093, 1110 (N.D. Ohio 2020) (finding that "Ohio treats employment discrimination and retaliation claims as tort causes of action") (Barker, J.); *accord Nelson v. Indegene, Inc.*, No. 25-01284 (GC) (JBD), 2025 U.S. Dist. LEXIS 219798, at *13 (D.N.J. Nov. 6, 2025) (applying the Restatement (Second) of Conflict's tort analysis to the plaintiff's CEPA claim); *Supreme Oil Co. v. Mass Polymers Corp.*, No. 15-cv-2344 (SRC)(CLW), 2016 U.S. Dist. LEXIS 32493, at *12–13 (D.N.J. Mar. 11, 2016) (same).

characterizes this as an "admission."  (Doc. No. 37, PageID #392.)  Defendants make no contrary argument in their Reply.  Based upon Defendants' concession, the Court finds that the place of injury in this case is New Jersey.  *Mendoza*, 674 F. Supp. 3d at 450 (holding the place of injury in a wrongful termination case is where the plaintiff lives and works); *Walker v. Nationwide Mut. Ins. Co.*, No. 16AP-894, 2018 Ohio App. LEXIS 1942, at *10 (Ohio App. 10th Dist. May 8, 2018) ("Because a plaintiff's injury in a wrongful termination claim is the loss of employment, the place where the plaintiff lives and works is the place of injury"); *Hoyt v Nationwide Mut Ins. Co*., No. 04AP-941, 2005 Ohio App. LEXIS 5700, at *17 (Ohio App. 10th Dist. Dec. 1, 2005) ("Kobell lived and worked in New Jersey. Regardless of the label used, the main thrust of Kobell's claims is the injury to her employment. Therefore, the place of the injury, which is presumed to be the state with the most significant relationship, is New Jersey.").

Because New Jersey is the place of injury, New Jersey law will apply "assuming Ohio's interest does not outweigh [New Jersey's] interest under the remaining factors." *Sharqawi v. Kirby Co.*, 496 F. Supp. 3d 1093, 1106 (N.D. Ohio 2020) (Barker, J).  This is because the place of injury is presumed to be "the state with the most significant relationship to this lawsuit."  *Id.*; *see also Malcmacher v. Jesse*, 786 F. App'x 558, 565 (6th Cir. 2019) ("there is a presumption that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit"); *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984) ("a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit").

The Court therefore looks to the remaining factors to see if they overcome this presumption. As explained below, the Court finds that they do.

11

The parties' place of business is predominantly in Ohio.  In their Motion, Defendants argue that "NOSC is organized pursuant to the laws of the State of Ohio, has its principal place of business in Ohio, and exclusively provides services in Ohio." (Doc. No. 34-1, PageID #177.)  Plaintiff argues, without citation to any legal authority, that this factor is neutral because "Plaintiff is located in and worked from New Jersey while Defendants are located in and worked from Ohio and Virginia." (Doc. No. 37, PageID #392.)  Defendants argue, in turn without citation to any legal authority, that Plaintiff's characterization of this factor is wrong because "Plaintiff disregards the relationship that multiple Defendants have to the state of Ohio as compared his lone connection New Jersey: NOSC's principal place of business is in Ohio; Meier lives and works in Ohio; and Dr. Gobezie spends about 50% of his time living and working in Ohio." (Doc. No. 39, PageID #726.)

Based on the Court's own research, the Court agrees with Defendants that this factor supports the application of Ohio law because the majority of the parties' place of business is in Ohio, NOSC is incorporated in Ohio, Meier resides and works in Ohio, and Gobezie spends 50% of his time in Ohio while working for NOSC. *Middleton v. Hollywood Reporter, LLC*, 686 F. Supp. 3d 1272, 1276–77 (S.D. Fla. 2023) ("While Plaintiff alleges he is domiciled in Florida, all three Defendants either reside or maintain a principal place of business in Los Angeles County, California . . . Thus, this factor weighs in favor of California"); *Abington Emerson Capital, LLC v. Adkins*, No. 2:17-cv-143, 2021 U.S. Dist. LEXIS 30883,  at *73 (S.D. Ohio Jan. 22, 2021) (declining to apply California law and deciding to apply Ohio law "[b]ecause the overwhelming majority of the parties are located in Ohio or Texas").

Ohio is where the conduct causing the injury occurred.  Defendants argue that "[t]he conduct giving rise to Plaintiff's termination took place in Ohio, as Dr. Gobezie and Meier made the

12

termination decision in Ohio." (Doc. No. 34-1, PageID #178.) Plaintiff responds that "the place where the conduct causing the injury occurred weighs in favor of New Jersey" because "Plaintiff was in New Jersey at the time he raised the concerns that ultimately resulted in his wrongful termination." (Doc. No.37, PageID #392.) Defendants argue in their Reply that "in wrongful termination cases, the place where conduct causing the injury occurred is the state from which the dismissal decision emanated, not where the employee engaged in the purported conduct that he believes caused his injury." (Doc. No. 39, PageID #726–27 (cleaned up).) The Court agrees with Defendants. *Sharqawi*, 496 F. Supp. 3d at 1106 ("Sharqawi has alleged that Defendants are headquartered in Ohio and that Lamb, Fetzer's Vice President and General Counsel, terminated his employment . . . [a]ccordingly, this factor favors applying Ohio law, rather than Florida law"); *Kirk v. Shaw Envtl., Inc.*, No. 1:09-cv-1405, 2010 U.S. Dist. LEXIS 51332, at *18 (N.D. Ohio May 25, 2010) (finding this factor weighed in favor of Louisiana when the decision to fire plaintiff was made in Louisiana).

The parties' relationship is centered in Ohio. Defendants argue in the motion that "Plaintiff's employment relationship with NOSC was centered in Ohio" because "he reported to and took instruction from supervisors in Ohio, performed revenue cycle management duties for services provided in Ohio, and received paychecks issued from Ohio." (Doc. No. 34-1, PageID #178.) Plaintiff responds that: (1) "[a]lthough NOSC is located in Ohio, it posted a nationwide advertisement for the remote position of Revenue Cycle Manager," (2) "Plaintiff applied for that position from New Jersey, which he disclosed on his submission," (3) "Defendants interviewed Plaintiff twice and offered him employment while he was located in New Jersey," (4) Plaintiff executed the responsibilities of his job with Defendants from New Jersey," (5) "Plaintiff made the complaints that gave rise to his wrongful termination from New Jersey," and (6) "Defendants terminated Plaintiff's

employment while he was located in New Jersey." (Doc No. 37, PageID #393.)  Defendants argue in their Reply that "this relationship could not possibly have been 'centered' in New Jersey when the only connection to the state was Plaintiff's presence in it." (Doc. No. 39, PageID #727.)  They assert that: (1) "Plaintiff's employer, NOSC, is organized and exists pursuant to the laws of the State of Ohio, has its sole place of business in Ohio, and exclusively provides services to patients in Ohio," (2) "Plaintiff took instruction from supervisors located in Ohio and was responsible for overseeing the NOSC's revenue cycle management processes for revenue generated exclusively in Ohio," (3) "[n]o one from NOSC ever met with Plaintiff in New Jersey and NOSC issued Plaintiff's paychecks from Ohio," and (4) "Plaintiff was the only NOSC employee who worked in New Jersey." (*Id.*)

Although Plaintiff was employed in New Jersey, the relationship was centered in Ohio.  "The parties had substantial contact with [Ohio], where [NOSC] was incorporated and located, where [Defendants] decided to hire [Plaintiff] . . . and where [Defendants] decided to fire [Plaintiff]." *Parsons v. Priester Aviation, LLC*, No. H-22-105, 2022 U.S. Dist. LEXIS 85831, at *23 (S.D. Tex. May 12, 2022).  In addition, Plaintiff initially reported the 401(k) issues that are central to his claim to Meier while she was in Ohio.  *Poulos v. Summit Hotel Props., LLC*, No. 09-4062-RAL, 2010 U.S. Dist. LEXIS 124458, at *21 (D.S.D. Nov. 23, 2010) (holding South Dakota law applied to the dispute when a Georgia employee was supervised by employees in South Dakota, the employee's termination letter was sent from South Dakota, and the plaintiff "reported his claim of retaliation to [another employee] by calling her while she was in South Dakota").  Moreover, the fact that the District of New Jersey concluded that it lacked personal jurisdiction over Defendants also "underscor[es] [Ohio's] central role in the [p]arties' relationship and the events leading to this dispute. *Isakson v. Roberts Marke Weinberg Butler Hailey PC*, No. H-24-1317, 2025 U.S. Dist. LEXIS 123493, at *10

14

(S.D. Tex. June 30, 2025). The Court therefore concludes that this factor weighs in favor of Ohio law.

The remaining factors do not point conclusively to either state. Defendants do not argue that any of the remaining factors support the application of Ohio law in their Motion. (Doc. No. 34-1, PageID #178–79.) And Plaintiff does not meaningfully analyze the remaining factors. He asserts that: (1) "the policies of Ohio and of New Jersey and their relative interests in the determination of the particular issue weigh heavily in favor of New Jersey," and (2) "[t]he protection of justified expectations also weighs heavily in favor of New Jersey." (Doc. No. 37, PageID #393.) Defendants disagree of course. They argue "Defendants have no relationship with the state of New Jersey whatsoever; they simply employed an individual who happened to reside there," and that "it is far from sufficient to create an expectation on Defendant's part that, as Ohio employers, New Jersey's discrete whistleblower statute would govern them." (Doc. No. 39, PageID #728.)

Based on these arguments, the parties only focus on three of the remaining factors: (1) the relevant policies of the forum, (2) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, and (3) the protection of justified expectations. So too does the Court. But these factors are not conclusive as to either state. Ohio and New Jersey have policies protecting whistleblowers. Plaintiff would expect to be protected by New Jersey statutes will residing there, and Defendants would expect to be bound by Ohio statutes since they work there. Simply put, the remaining factors, as argued by the parties, are neutral at best.

On balance, "[o]nly Plaintiff's residency in [New Jersey] weighs in favor of applying [New Jersey] substantive law." *Shar v. Meier Enters.*, No. 3:17-cv-00226-JE, 2018 U.S. Dist. LEXIS 156246, at *13 (D. Or. Sept. 13, 2018). Based upon the parties' places of business, where their

15

relationship was centered, and where the conduct causing Plaintiff's injuries occurred, the Court finds that Ohio has the most significant relationship to this dispute.   Accordingly, the Court finds that Ohio law governs this dispute.

### C. Because Ohio law governs, Defendants are entitled to summary judgment on Plaintiff's CEPA claim

Defendants argue in their Motion that "[b]ecause New Jersey law does not apply to Plaintiff's claims, Plaintiff's CEPA claim must be dismissed."  (Doc. No. 34-1, PageID #178.)  Plaintiff does not dispute that if Ohio law governs his claims, his CEPA claim would fail.[2]  (Doc. No. 37.)  Defendants point this out in their Reply.  They assert that "[b]y failing to address Defendants' argument that his CEPA claim is not viable under Ohio law, Plaintiff concedes that if Ohio law applies, his CEPA claim must be dismissed."  (Doc. No. 39, PageID #729.)  Notwithstanding Plaintiff's waiver, the Court finds that because Ohio does not recognize the CEPA, Defendants are entitled to summary judgment on Plaintiff's CEPA claim.  *See Sharqawi*, 496 F. Supp. 3d at 1107 (finding that Florida law applied to the dispute and dismissing Ohio common law claim for wrongful termination); *MV Circuit Design, Inc. v. Omnicell, Inc.*, No. 1:14 CV 2028, 2015 U.S. Dist. LEXIS 37688, at *36–37 (N.D. Ohio Mar. 24, 2015) (finding that Colorado and California law did not apply to dispute and dismissing civil aiding and abetting claim because Ohio does not recognize that tort); *Andersons, Inc. v. Consol, Inc.*, 185 F. Supp. 2d 833, 837 (N.D. Ohio 2002) ("Because plaintiff asserts the failure to negotiate in good faith claim under Pennsylvania law and Ohio law governs this action, plaintiff's claim shall be dismissed"), *aff'd* 348 F.3d 496 (6th Cir. 2003).

---

[2] Plaintiff's Opposition is entirely premised upon New Jersey law applying to his claims.

**IV.** **Conclusion**

For the reasons set forth herein, Defendants' Motion (Doc. No. 34) is GRANTED.

**IT IS SO ORDERED.**

 _s/Pamela A. Barker_
PAMELA A. BARKER
Date:  July 31, 2026                         U.S. DISTRICT JUDGE

17